UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PATRICK GEORGE HIGUERA, JR., | ) | No. C 10-5241 JSW (PR) |
| Petitioner, | ) | |
| v. | ) | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |
| G.D. LEWIS, et al., | ) | |
| Respondents. | ) | |

## INTRODUCTION

Petitioner Patrick George Higuera, Jr., a California prisoner proceeding pro se, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus, an evidentiary hearing on the claims, and a new trial. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the court. Petitioner responded with a traverse. For the reasons set out below, the petition is DENIED.

## BACKGROUND

### I. Procedural Background

On August 31, 2005, a jury convicted Petitioner and three co-defendants of first-degree murder in violation of Cal. Penal Code § 187. They also received sentencing enhancements after the jury found that the murder was committed for the benefit of a criminal street gang (Cal. Penal Code § 190.2(a)(22)) and that a felony was committed for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)). The same jury convicted

1  a fifth defendant, Mario Ochoa-Gonzales (Ochoa), of being an accessory to a felony under
2  Cal. Penal Code § 32.  Ochoa also received the sentencing enhancement described in §
3  186.22(b)(1). Due to the § 190.2(a)(22) gang enhancement, Petitioner was sentenced to a
4  term of life in state prison without the possibility of parole.
5        All defendants except Ochoa appealed to the California Court of Appeal.  In an
6  unpublished opinion, the Court of Appeal affirmed the trial court's judgment  in all respects,
7  except as to defendant Cardenas, whose § 186.22(b)(1) enhancement was stricken. (Ex. C at
8  1.)[1]  Defendants' petition for review to the California Supreme Court was denied.  (Pet. at
9  33.)

## II.    Factual Background

The Court of Appeal summarized the facts of the case as follows:

> On the night of June 26, 2002, defendants were hanging out at defendant Amante's apartment on Stony Point Road in Santa Rosa, where he lived with his fiancée Kacee Dragoman and their small child.  Defendants were all members of the Norteño street gang.  Amante's mother, her boyfriend, Dragoman, Lindsey Ortiz (Amante's teenaged cousin, who lived in a nearby apartment), and Amante's and Dragoman's young son also were present at the apartment.  Defendants were drinking beer, playing cards, and watching television.  Amante's mother and her boyfriend eventually went upstairs to bed.
>
> Dragoman and defendant Ochoa were talking on a patio outside the living room around midnight, when people heard whistles coming from outside the apartment.  According to various witnesses, including the prosecution's expert witness on criminal street gangs, members of the Sureño gang and other Mexican nationals use a particular whistle to identify themselves.  Dragoman testified that when she heard the whistle, "It was a bad sign.  It's a rival gang whistle."  Ochoa reported that he heard the whistle coming from the other side of a fence that separated the apartment from Santa Rosa Creek and that there were "Scraps" (a derogatory term for a member of the rival Sureño gang) in the area.  At the time, members of the Norteño and Sureño gangs had rival claims to the area by the creek near Stony Point Road.  Ochoa also whistled. Defendants ran quickly to the kitchen, opened drawers, then left the apartment; Dragoman and Ortiz followed.
>
> On a nearby bridge on Stony Point Road in a parked car were Rebecca Sandoval (Rebecca) and her small child and stepchild; her husband Miguel Sandoval (Miguel) was outside the car speaking with his father.  Miguel had seen his friend Ignacio Gomez (who he knew only as "Jose," another name Gomez went by) riding his bicycle on the bridge.  Gomez lived with his fiancée

---

[1] The unpublished opinion of the Court of Appeal is lodged with the Court by the Attorney General as Exhibit C.

in a nearby homeless camp, where he bought and sold methamphetamine and heroin. According to Gomez's fiancée, Gomez was not a gang member, but his friends were associated with the Sureño gang, and he typically wore blue clothing, which was associated with the Sureño gang. Jose, Miguel, and Miguel's father whistled to each other on the bridge and greeted one another.

Rebecca testified that she "heard people jumping a fence," and shortly thereafter she saw Ochoa (who she recognized from a youth center) and someone else head toward the bridge she was on. They were followed about a minute or a minute and a half later by Higuera (an acquaintance of Rebecca's) and another man she did not recognize. As the four men crossed the bridge, one of them said, "What's up" to Miguel, and another said "Norte." The four crossed the bridge, then three of them went down a bike path under the bridge; Ochoa stayed back.

Dragoman and Ortiz, who were the last to leave Amante's apartment, walked down a path and found Amante (who was wearing a red 49ers jersey) stuck by his pants leg on the fence separating him from the creek. Ortiz described Amante as drunk. While Dragoman and Ortiz were loosening Amante's pants from the fence so that he could get down, a large butcher knife fell from Amante's pocket.

After Amante was freed from the fence, he picked up the knife he had dropped and ran to the people near the car parked on the bridge on Stony Point Road; Amante was holding the knife as if he were going to stab someone. Dragoman and Ortiz left the apartment complex through another route and met up with Amante at the bridge. Amante spoke to the people in the parked car, then dropped the knife he was holding. Dragoman testified that she believed Amante picked up the knife and put it in his pants. Amante crossed the bridge (which was illuminated by street lights), then ran down the path to the creek where the three other defendants had gone. Ortiz followed him but at first could not see anything because it was so dark. Dragoman testified that she saw Amante walk down, meet up with Higuera, Cardenas, Ochoa, and Lopez, then walk back up to the bridge 30 seconds later.

Miguel testified he saw five males and two females on the night of the murder. One of the men asked Miguel if he "bang[ed] Norte," and Miguel answered that he was just talking to his father. Miguel interpreted the question about banging Norte as "he just wanted problems. But at that time, I mean, I'm not a gangster, so, you know, I just told him I don't bang nothing." Miguel saw a black handle in the pocket of the man who asked if he banged Norte, but he did not know whether it was a knife.

Miguel testified that Gomez rode his bicycle down a path under the bridge. Miguel testified that "that's when I heard they stop him, they stop Jose, and that's when I— when that happened." When the men stopped Jose, Miguel heard one of them ask Jose whether he was a Sureño. He testified that he heard people hitting Gomez and calling him "a lot of bad words," and he heard Gomez yelling "help" and screaming. Miguel saw three men (the person who asked if he "bang[ed] Norte" and two others) hitting Gomez, and he saw one of the men stabbing Gomez with a knife. During the attack, a man wearing a red 49ers jersey over a tank top approached Miguel, dropped a knife on the ground in front of Miguel's car, then picked it up and ran toward the other men. Miguel testified that the man "went all the way to with the other guys where

3

Jose was and the other guy, one of the girls was telling him to stop. And that's when my friend Jose, I heard he was not screaming no more. That's when the other guy and the other two girls came with him to see what happened." He also testified that "the first time I thought it was just fighting, but when the guy—the other guy came running and he dropped a knife, I know something was happening because he was yelling, and after that he just—he was so quiet." After the man who dropped the knife started running to catch the other guys, "[t]hey were all fighting. And that's when the other guy and the two girls came all together. That's when—when there was no noise. And that's when I heard the bike fall on the floor."

Gomez suffered 38 to 40 stab wounds on his head, face, chest, back, and shoulders; he died from multiple wounds to the torso after being stabbed in the heart and lungs. It could not be determined whether one or more stabbing instrument was used. A forensic pathologist opined that one person could have inflicted all of the stab wounds in less than a minute, and that the victim lived only a couple of minutes after he was stabbed in the heart.

Approximately five minutes after Ortiz had started down the path, Ortiz saw Ochoa (who was not armed) coming up the path. He was followed by Cardenas and Lopez, who ran up the path toward Ortiz. Lopez had blood on his black and white Raiders jersey; Ortiz did not see a knife on him. Ortiz did not see blood on Cardenas, and she never saw him with a knife. Ortiz continued down the path, and eventually saw Amante and Higuera. Amante was running; Higuera's arm was cut, and he was acting as if he were in pain.

After defendants came up from the creek, they returned to Amante's and Dragoman's apartment. As they were walking back across the bridge, Ortiz and defendants lifted their shirts up toward their heads after Ortiz saw a police car and directed the others to hide their faces. Rebecca and Miguel drove to a nearby convenience store so that Rebecca could call 911, because it was obvious to her that "something happened."

When the group returned to Amante's apartment, five members of the Norteño gang joined them. Lopez told Amante that "this was for Cinco de Mayo," talked about "eating people," then put on a blue beanie hat with "Sur" written on it that he had not been wearing when he left the apartment. Dragoman testified that Lopez "was kind of like bragging like walking around with a little strut, stuff like that, kind of like a larger than life moment for him or something." Ortiz testified that after Lopez made the remark about Cinco de Mayo, "Pete, he said—I think he said, 'What the fuck are you talking about?' And then Rico [Lopez] said something after that and then everyone just got quiet." Ochoa paced nervously, said he was concerned about police being at the creek, and commented, "I don't think that guy was a Scrap." Ochoa flushed a black handle from Dragoman's knife set down the toilet. Higuera was on the telephone, had a t-shirt wrapped around his right arm and was applying pressure to it, and appeared to be in a rush to leave. Lopez had blood on his shoes. Ortiz and Dragoman helped wash Lopez's and Ochoa's clothing.

Police found the victim the next morning near a bike path on the north side of the creek. When police found the victim, his pants were pulled down below his waist. He was wearing blue clothing consistent with what Sureño gang members wear. Police found Sureño and Norteño gang graffiti in the area near where Gomez was found. Some Norteño graffiti had been written over Sureño

4

graffiti, a "crossout" that was "a huge form of disrespect in the gang world," according to the prosecution's gang expert. As discussed more fully below, the expert also testified that it was his opinion that defendants were active members of the Norteño street gang at the time of the murder, and that such a murder would be committed for the benefit of the gang because killing a rival gang member would show the gang's power and instill fear of the gang in the community.

On the night of June 28, Detective Leslie Vanderpool returned to the bridge with Miguel, who directed the officer to the apartment where Amante lived. Miguel later identified Amante (in a photographic lineup) as one of the people who stabbed the victim.

(Ex. C at 1-7.)[2]

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority under the first clause of Section 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of Section 2254(d)(1), if it correctly

---

[2] The opinion of the California Court of Appeal was not published in official reports. California Rules of Court, rule 8.115(a), prohibits courts and parties from citing or relying on opinions not certified for publication, except as specified in rule 8.115(b), as is the case here.

identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A Petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not suffice. *Id.*

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

## ANALYSIS

Petitioner presents two grounds for federal habeas relief: (1) that testimony by the prosecution's gang expert violated Petitioner's right to due process because it was unfounded and prejudicial; and (2) that the trial court deprived Petitioner of his right to due process by refusing to dismiss a juror who had contact with family members of one of the defendants.

**I.   Expert Testimony**

Petitioner objects to testimony by the prosecution's gang expert during an exchange with the prosecutor on July 27, 2005. To provide support for the gang-related sentencing enhancements, the prosecution obtained expert testimony from Detective Robert Scott, an

6

expert on criminal street gangs.[3] The prosecutor, Mr. Brady, asked Detective Scott a hypothetical question about when a crime could be considered committed "for the benefit of" a gang:

> **Q BY MR. BRADY:** Detective, I would like to ask you a hypothetical question right now. And for the hypothetical question, I would like you to assume certain facts to be true. Are you with me?
>
> **A:** Yes.
>
> **Q:** First of all, I would like you to assume that there was a person that was wearing mostly blue clothing including a blue beanie with the word "SUR" on the forehead, blue sweatshirt; that that person was alone on a bike, young Hispanic male adult, in the area of Stony Point Road and the Santa Rosa Creek—
>
> **A:** Okay.
>
> **Q:** —in the early morning of June 27, 2002; and that he whistled in the style that some people associate with Sureño gang members and that others whistled in that same style as well; and that these five defendants were close enough to hear those whistles in the vicinity of the creek and that when the whistles were heard that one or more of them talked about Scraps being out by the creek; and that shortly thereafter, all five left the apartment where they had been when they heard that; that one or more grabbed knives from the apartment and headed across the bridge on Stony Point to the north side of the creek; and that one of them as they passed stated to a citizen standing nearby words to the effect of, "Do you gang — []Do you bang Norte?"; and that very shortly thereafter, the person that we described as the Hispanic male, was stabbed to death approximately 40 times.
> Do you have an opinion about whether that crime was committed for the benefit of or in association with a criminal street gang?
>
> **A:** Yes, I would have an opinion on that.
>
> **Q:** And what is the basis for your opinion?
>
> **A:** Well, the basis for my opinion based on the hypothetical you described would be the clothing worn by the person killed, that the clothing would be consistent, from what I know, to be worn by Sureño gang members or Sureño affiliates; that subjects leaving an apartment, grabbing weapons on the way out and heading to a scene would be consistent with subjects preparing to engage in confrontation; that subjects who, if they were Norteño gang members, heading across a bridge asking an uninvolved citizen if they bang Norte would be consistent with subjects looking for a confrontation to occur; if one or more

---

[3]California Penal Code §§ 186.22(b)(1) (felony committed for the benefit of a criminal street gang) and 190.2(a)(22) (defendant intentionally killed victim while defendant was a member of a criminal street gang, and murder was committed to carry out activities of the criminal street gang).

7

> of the subjects then went down and stabbed a subject to death approximately 40 times, this would be consistent with carrying out an assault on a rival gang member, from my perspective.
> And given those hypotheticals and that scenario, there are a number of benefits that I could see for the Norteño criminal street gang, and since the hypothetical is that these five people are Norteño gang members, then clearly this crime would be committed in association with the Norteño criminal street gang.

(20 RT 3783-85.)[4] Petitioner objects to this testimony in two respects. First, he contends that Detective Scott improperly testified to ultimate issues of fact. Second, Petitioner contends that Detective Scott's testimony improperly assigned different roles in the murder to the defendants.

### A. Expert Testifying to an Ultimate Issue of Fact

Petitioner claims that Detective Scott improperly testified to ultimate issues of fact, which should be decided solely by the jury. Here, the ultimate issue was that the defendants committed the crime for the benefit of the Norteño criminal street gang. Petitioner claims that some of Detective Scott's comments ("these five people" and "this crime") and the way the prosecutor introduced the hypothetical ("these five defendants") were improper because the statements referred to the five actual defendants, not the five subjects from the hypothetical. (Pet. at 2A.) Petitioner argues that, in making these statements, Detective Scott impermissibly offered a conclusion about whether he believed the defendants themselves committed the crime for the benefit of a criminal street gang, something which only the jury should decide. (*Id*. at 1A.)

A writ of habeas corpus may be granted only when the state court's opinion "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1) (emphasis added). As a prerequisite for granting the writ, the Supreme Court must have decided the issue in question. *See Williams (Terry)*, 529 U.S. at 412-13. The Supreme Court has not determined that an expert's testifying to an ultimate issue of fact

---

[4]The Reporter's Transcript of the trial court hearing is lodged with the Court by the Attorney General as Exhibit B.

8

is a violation of the Constitution. *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009); *accord Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011). Because the Supreme Court has not determined whether federal law is violated when an expert testifies to an ultimate issue of fact, the state court's opinion could not have been "an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For this reason alone, Petitioner's argument fails.

The claim also fails under Ninth Circuit precedent. In the Ninth Circuit, while "[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence[,] . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact." *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990). Here, even though the prosecutor said "these five defendants" while setting up the hypothetical, it is clear from Detective Scott's answer as a whole that he was referring to the subjects from the hypothetical and not to the defendants. In his answer to the question, Detective Scott uses the words "subjects" (never "defendants"), begins by saying that his opinion is "based on the hypothetical [Mr. Brady] described," and concludes by saying, "And given those hypotheticals and that scenario . . ." (20 RT 3785.) By using these words, Detective Scott indicated that his opinion was in regard to the hypothetical "defendants," not the five actual defendants on trial. When Detective Scott's whole testimony is considered, he did not impermissibly offer his opinion on the ultimate issue of the defendants' own subjective mental states during the commission of the crime.

### B. Expert Testimony on the Roles of the Defendants

Petitioner further argues that Detective Scott's testimony about the typical roles played by gang members in an assault was improper. (Pet. at 1A-2A.) Petitioner's argument appears to be that, by describing the typical roles gang members play in an assault, Scott imputed such roles to the defendants and thereby testified to their intent or motive. Petitioner claims that an expert may not testify to a defendant's intent or motive.

Petitioner cites no federal authority, however, and the Court is aware of none, that

expert testimony on a defendant's subjective intent is unconstitutional. The Federal Rules of Evidence prohibit an expert from giving an opinion as to the defendant's subjective mental state at the time the crime was committed. *U.S. v. Kinsey*, 843 F.2d 383, 388 (9th Cir. 1988) (overruled on other grounds by *U.S. v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000)). California law also contains such a prohibition. *See People v. Killibrew*, 103 Cal. App. 4th 644, 658 (2002). However, federal habeas relief is not available for violations of either the Federal Rules of Evidence, which do not apply to state court proceedings, or for violations of state law. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). In the absence of any authority that such testimony violated due process or some other federal law applicable to state criminal proceedings, habeas relief may not be granted on this claim.

In any event, Detective Scott did not testify to the defendants' subjective knowledge and intent. The prosecution argued to the jury that it could find any or all of the defendants guilty of murder under one of two theories of accomplice liability, so long as the jury found that one of the defendants stabbed the victim. (Ex. C at 9.) To support his theory of accomplice liability, the prosecutor asked Detective Scott, "In a gang attack of this type, are there differing roles that Norteños play when there's a group involved?" (20 RT 3787.) Detective Scott testified that, in an assault on a rival gang member, "the gang members are expected to participate if they are in the area of that assault. To not participate could in fact cause retribution to be brought upon them." (*Id*.) During the trial, Petitioner objected to this question on the ground that it was speculation, but was overruled. (*Id* at 3787, 3795.)

The Court of Appeal concluded that Detective Scott did not speak to defendants' subjective intent but instead offered testimony on the typical roles of gang members (not the roles of the defendants), a topic sufficiently outside the realm of common understanding so as to require an expert. (Ex. C at 44, 46.) Testifying about the roles gang members play in an assault is not akin to testifying that the defendants in this case intended to commit the crime for a gang-related purpose. Supreme Court precedent makes clear that an expert may testify to a hypothetical situation. *Barefoot v. Estelle*, 463 U.S. 880, 903 (1983); *see also Briceno v.*

10

*Scribner*, 555 F.3d 1069, 1078-79 (9th Cir. 2009) (habeas relief not available because expert who testified to hypothetical subject's intent could not have been testifying to defendant's intent). Throughout the portion of the examination at issue here, Detective Scott repeated that his opinion was based on "his experience" of gang assaults "in general." (*Id.*) At no point did Detective Scott mention that he believed that the five defendants on trial aided and abetted the person who actually stabbed the victim, or that they themselves committed the crime for any particular reason. He was still testifying either to the prosecutor's hypothetical or to gang assaults in general, based on his experience. In refusing to overturn an expert's testimony based either on a hypothetical or on the expert's experience, the Court of Appeal did not unreasonably apply federal law.

Petitioner, having failed to show that the Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law, or that the decision involved an unreasonable determination of the facts in light of the evidence presented, is not entitled to federal habeas relief based upon his first claim.

## II. Juror Bias and Misconduct

Petitioner contends that he was deprived of his Fourteenth Amendment right to due process because Juror No. 1499 committed misconduct twice: first, because of prior contact with co-defendant Ochoa's relatives; and second, by discussing the case with other jurors. (Pet. at 5A.) The Court of Appeal summarized the facts:

> Toward the conclusion of trial, a juror reminded the trial court that he had a prepaid vacation coming up in a few days, as he had previously informed the court. The trial court excused the juror for cause and replaced him with an alternate (identified in the record only as Juror No. 1499). The next day, the trial court reported to defendants' counsel that it had received a voicemail from the dismissed juror, who claimed that the alternate had learned during trial that she and her husband knew the family of defendant Ochoa. The dismissed juror returned to court, was sworn, and testified that his replacement had told him a few days earlier that she was not comfortable about serving as a juror, because she realized during trial that her husband played soccer with someone who had been attending the trial. According to the dismissed juror, the alternate realized at some point that the person attending the trial was related to defendant Ochoa in some way.
>
> The trial court questioned the alternate juror, who reported that she realized on the second or third day of trial that there was someone in the audience whom

11

she had met the previous weekend. She asked the bailiff whether "it was important or not," but the bailiff told her "as long as [she] didn't know any of the defendants or any of the lawyers, it didn't matter." The juror saw two people (a man and a girl), whom she recognized as audience members from the trial, "almost every weekend" at her husband's soccer games, where the man played with the juror's husband. The juror did not realize until toward the end of trial (about two months after it began) how the man and girl were connected with one of the defendants. She overheard someone say the girl's last name, which led the juror to believe that the girl was Ochoa's sister and the man was Ochoa's father. At one point (apparently, during trial), the alternate hosted people associated with the soccer team (including the people she believed to be Ochoa's father and sister) at her home, and the females were in the juror's spa together. The alternate explained that she had never talked with Ochoa's relatives privately, that the relatives had never looked at her when they were at the courthouse, and that they had never discussed the trial with her. The alternate juror told the trial court that she was "trying to be really honest and really fair," and she did not think that the connection through her husband's soccer team would "affect [her] in any way." The alternate also explained that she was not worried about how a verdict would affect her relationship with people on her husband's soccer team and their wives, stating, "Like I said I—I just met them [Ochoa's relatives] not too long ago, so they're not really my friends."

Counsel for Amante, Cardenas, Higuera, and Lopez sought the discharge of the alternate juror, but the trial court did not believe that there was cause to discharge her. The court nonetheless questioned the alternate further regarding whether she had discussed recognizing audience members with other jurors. The juror stated that she had raised the concern with another woman on the jury, who recommended that the juror speak with the bailiff (which she did). She also discussed the issue with the juror she replaced. The alternate said she had not discussed the issue with her husband. The trial court directed the juror not to discuss with other jurors the fact that she had been questioned, and not to have contact with the people whom she believed to be Ochoa's relatives.

The next day, the trial court questioned the bailiff with whom the alternate spoke when she first realized that she might recognize people attending the trial. The bailiff testified that the alternate had mentioned to him "in the very beginning of the trial when she got here" that she might recognize someone in the audience. He directed her to raise the subject during voir dire. He testified that he "got the impression that she may recognize someone in the audience. She wasn't sure. That's the impression that I got."

The trial court again briefly questioned the alternate, who stated that the people she recognized had been at her house "[t]hree Sundays ago." She stated that she was not sure about the possible relationship between them and Ochoa until the following Sunday, when someone mentioned the girl's last name. The juror "knew for sure" the relationship the following Friday, when she "saw the men talking to [Ochoa's attorney]." After the court concluded questioning the juror, counsel for Amante, Cardenas, Higuera, and Lopez renewed their objection to retaining the juror. The trial court declined to excuse the juror.

(Ex. C at 67-69.)

The Sixth Amendment to the Constitution "guarantees to the criminally accused a fair

12

trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A lack of impartiality affects the Sixth Amendment right, which implicates the Fourteenth Amendment right to due process. *See id.* The right to due process is violated even if only one juror is biased or prejudiced. *See Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990). However, "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Juror bias is a question of historical fact; that is, bias turns on what the juror said and did and whether the juror's statement that he or she could be impartial was credible. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). In order to receive relief based a factual determination, Petitioner must show that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. A trial court's determination of juror bias is given "special deference," both on direct appeal and in habeas proceedings, because juror bias is largely a function of the credibility of the juror. *Patton*, 467 U.S. at 1038.

### A. Juror Contact with Co-Defendant's Family Members

Petitioner contends that Juror 1499 "had a substantial emotional involvement with [Ochoa's] family at soccer games." (Traverse at 6.) The best evidence that Petitioner can muster in support of any *substantial* involvement is that Juror 1499 and her husband hosted a post-soccer-game barbecue at their house, to which Ochoa's father and sister apparently came, during which time the women at the barbecue used Juror 1499's spa. (Trav. at 7-8; 28 RT 5636.) Petitioner makes the same argument, supported by the same facts, that the Court of Appeal rejected, noting that the defendants "vastly overstate[d] the connection between

13

the juror and the people she believed to be Ochoa's family members." (Ex. C at 70.)[5]

The record supports the findings of both the Court of Appeal and the trial court that Juror 1499 was not biased due to the contact she had had with Ochoa's relatives. She hardly had any relationship at all with them – she saw Ochoa's father and sister perhaps once a week in the context of a soccer game, and then always in a group setting in which she never spoke to them privately. (28 RT 5636.) Ochoa's family members never indicated that they knew who she was, either inside the courtroom or outside, nor did they ever talk to her about the trial. (*Id*. at 5636-37.) When the trial began, Juror 1499 recognized Ochoa's father and sister in the audience, but still did not know who they were or that they had any relationship with the defendants. (*Id*. at 5635.) The relationship between the Ochoas and Juror 1499 was so attenuated that it was approximately six months into the trial before she realized who they were and that they might be related to Ochoa.

After conducting a hearing during which Juror 1499 said that her impartiality would not be affected, the trial judge was satisfied that "she [didn't] have enough relationship with these people to be [biased] one way or the other. Just somebody she knows in the community." (*Id*. at 5644.) The judge told her that she was not to have any further contact with Ochoa's relatives, even if that meant not attending any soccer games until the trial concluded. Juror 1499 agreed to this. (*Id*. at 5647-48.) In evaluating her demeanor, the trial judge noted that "[s]he was completely open here" and had "no hesitancy to explain anything." (*Id*. at 5644.)

Petitioner insists that "it's hard to believe that Juror 1499 'never talked' to Ochoa's relatives when they were at her house, in her spa." (Trav. at 8.) While Juror 1499 acknowledged that she may have talked to them at some point during the trial, (28 RT 5635-37), that was before she realized who they were and that they might have been related to Ochoa. As for the spa, Petitioner confuses the timeline of events: Juror 1499 recognized two

---

[5] It is unknown whether the people in the gallery were actually Ochoa's family members, but as one defense attorney pointed out, ". . . [I]t seems to be a distinction without a difference. If she thinks so, the effect is the same as if it is true." (28 RT 5645.)

14

people from the audience she had met a few days before at her husband's soccer game, but did not know who they were or why they were there. It was not until a week before becoming a juror — *after* the barbecue and spa-use at Juror 1499's house — that she realized the two people from the soccer game were Ochoa's family members. (28 RT 5635.) Given the totality of the circumstances – the attenuated relationship, the infrequency of contact, and not discussing the trial -- using the spa with a group on one occasion is insufficient evidence to establish bias.

Neither the trial court's decision to keep Juror 1499 nor the Court of Appeals' decision was "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Petitioner has failed to present sufficient evidence to show that the decision not to excuse Juror 1499 "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

### B.  Discussion with Other Jurors

Petitioner also contends that Juror 1499 committed misconduct by discussing with other jurors the fact that she recognized Ochoa's father and sister. Juror 1499 said that she mentioned this fact to another juror:

> **THE COURT:** Do you remember what you said to her?
>
> **JUROR NO. 1499:** I remember exactly. When the people were — when the people in the audience were in the hallway, when they walked by me, I said, "Oh, I know them." And later on in the break, I didn't know who they were connected to or anything. I didn't know that they were here. But after I saw them sitting here, I was like, "What are they doing here? Should I tell anyone?"
>
> **THE COURT:** So all you recall saying to the other jurors at the time was that you recognized someone in the hallway?
>
> **JUROR NO. 1499:** And as they walked by me, so I'm sure that [the other juror] knows who I recognized or whoever heard me.

(28 RT 5646-47.) Juror 1499 also said she had spoken with the dismissed juror she replaced, telling him that she was initially uncomfortable about becoming a juror because she recognized someone in the courtroom. (*Id*. at 5647.)

After conducting a hearing, the trial court admonished Juror 1499 not to speak about

15

the trial with other jurors outside the jury room. (*Id.*) The trial court found no misconduct because Juror 1499 "wasn't discussing the case. All she stated to another juror was that she recognized someone in the audience." (*Id*. at 5644.) The Court of Appeal found that, while Juror 1499 "technically committed 'misconduct'" both by interacting with Ochoa's family members after she recognized them in court and by discussing this fact with other jurors, these acts were not prejudicial. (Ex. C at 72.)

Discussing the case with other jurors ("premature deliberations") is improper, but not as serious as other types of misconduct, such as tampering, private communication, or press contact. *Davis v. Woodford*, 384 F.3d 628, 653 (9th Cir. 2004); *see also Remmer v. U.S.*, 347 U.S. 227, 230 (1954). What is important is that "each juror keep an open mind until the case has been submitted to the jury." *U.S. v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974). There is no evidence in the record, and Petitioner provides no evidence, to show that "the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id*. Petitioner has not shown that the Court of Appeal's finding that any misconduct was not prejudicial was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of clearly established federal law. Consequently, he is not entitled to federal habeas relief based upon his second claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: October 4, 2011

JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

PATRICK GEORGE HIGUERA JR,

    Plaintiff,

  v.

G.D.LEWIS et al,

    Defendant.

Case Number: CV10-05241 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 4, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Patrick George Higuera
F-23449
Pelican Bay State Prison
P.O. Box 7500
Crescent City, CA 95532

Dated: October 4, 2011

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk